UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

IVY MARCELLA GOSS                                    PLAINTIFF

VS.                          Civil No. 3:14-cv-03039

CAROLYN W. COLVIN                                    DEFENDANT
Commissioner of Social Security Administration

## MEMORANDUM OPINION

Plaintiff, Ivy Marcella Goss, brings this action under 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §423(d)(1)(A), 1382c(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. §405(g).

## I.      Procedural Background:

Plaintiff filed her application for DIB and SSI on June 9, 2011, alleging an onset date of March 15, 2010, due to kidney disease, fibromyalgia, anxiety and depression, constant chronic pain, sick stomach and vomiting. (T. 151) Plaintiff's application was denied initially and on reconsideration. (T. 52-54, 55-58, 63-66, 66-67). Plaintiff then requested an administration hearing, which was held in front of Administrative Law Judge ("ALJ"), Ronald L. Burton, on August 23, 2012.

At the time of the hearing, Plaintiff was 39 years of age, she graduated from high school and had one year of college education. (T. 153) Plaintiff's past relevant work experience included housekeeping from May 2005 to October 2009, a cashier from November 2009 to March 15, 2010,

1

fuel station employee from May 2007 to February 2008, and factory worker at temporary agencies from April 20, 2011 to June 07, 2011. (T. 153)

On February 1, 2013, the ALJ found Plaintiff's personality and mood disorder severe and her Loin Pain Hematuria Syndrome ("LPHS"), urinary tract infections and flank pain non-severe, as the ALJ determined they caused no more than minimal limitations on the Plaintiff's ability to perform basic work activities. (T. 13-14) The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: she could perform where interpersonal contact was incidental to the work performed; complexity of tasks was learned and performed by rote, few variables, and little judgement; and supervision required was simple, direct and concrete. (T. 16)

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on February 10, 2014. (T. 1-4) Plaintiff then filed this action on April 11, 2014. (Doc. 1) This case is before the undersigned pursuant to consent of the parties. (Doc. 5) Both parties have filed briefs, and the case is ready for decision. (Doc. 8 and 10)

## II.    <u>Applicable Law:</u>

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart,* 292 F.3d. 576, 583 (8th Cir. 2002). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Cox v. Asture,* 495 F.3d 617, 617 (8th Cir. 2007). The AJL's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d, 964, 966 (8th

Cir. 2003).   The Court considers the evidence that "supports as well as detracts from the Commissioner's decision, and we will not reverse simply because some evidence may support the opposite conclusion." *Hamilton v. Astrue,* 518 F.3d 607, 610 (8th Cir. 2008). If after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel,* 221 F.3d at 1068.

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairments, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

If such an impairment exists, the ALJ must determine whether the claimant has demonstrated that she is unable to perform either her past relevant work, or any other work that exists in significant numbers in the national economy. (20 C.F.R. §416.945). The ALJ applies a five-step sequential evaluation process for determining whether an individual is disabled. (20 C.F.R. §404.1520(a)-(f)(2003).   Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker,* 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §404.150, 416.920 (2003).

### III.   **Evidence Presented:**

The medical evidence is as follows.

On January 5, 2006, Plaintiff went to Bend Memorial Clinic, Bend, Oregon, with flank pain, hematuria, and fever.  The lab results showed an increase in bilirubin, ketones, blood, leukocytes, protein and positive for nitrites.  Plaintiff was assessed with acute right pyelonephritis, prescribed Tequin, and advised to take Tylenol and/or Ibuprofen for pain. (T. 481)

Plaintiff was seen at the Bend Memorial Clinic on January 26, 2006, due to a dull, constant pressure in her right flank with an occasional sharp and stabbing pain.  The notes indicated Plaintiff was under a considerable amount of stress, she had hematuria and a fever.  In July 2005, Plaintiff was diagnosed with pyelonephritis at St. Charles Medical Center. The doctor observed she was tender to palpation on her lower rib cage, back to front.  Plaintiff was assessed with muscular sprain, a left adnexal cyst was suspected and hematuria, persistent by treatment for pyelonephritis. An appointment for Bend Urology was scheduled for January 31, 2006. (T. 477)

On August 14, 2006, a surgical pathology report for a colon biopsy and polyp showed multiple fragments of colonic-type mucosa with orderly cylindrical glands showing no architectural or inflammatory change.  The basement membrane was of normal thickness and no parasites were identified.  The section showed multiple fragments of colonic-type mucosa, many of which demonstrates surface glands with serrated change. (T. 485)

Plaintiff sought mental health treatment in February 2009 to May 2009 with Sherry Adams, licensed social worker at Deschutes County Mental Health ("Deschutes").  During her therapy, Plaintiff did well under the stressors of her life.  She continued to work and wanted to go to school for certified nurse assistant. (T. 352, 350) Through the course of treatment, Ms. Adams notes indicated Plaintiff was not giving up and she tried harder. On April 8, 2009, Ms. Adams observed

Plaintiff was tired and in a lot of pain.  She had been taking pain medication, felt increased agitation, and was not able to focus. (T. 346) Plaintiff called Ms. Adams on September 15, 2009, and informed Ms. Adams she was moving to Washington, due to her granddaughter's health problems. (T. 335-353)

Plaintiff went to the emergency room at Forks Community Hospital, Forks, Washington, due to sharp, hot pain in her right lower quadrant on December 9, 2009.  Plaintiff's urinalysis showed the presence of blood and her red blood cell, white blood cell and absolute monocyte counts were high. (T. 259) A CT of the abdomen and pelvic showed significant stool without signs of stasis. (T. 270) No urinary tract calcifications or hydronephrosis was seen.  The kidneys and bladder demonstrated normal noncontract appearances.  The uterus and ovaries were unremarkable and there was no free fluid. (T. 271) The doctor's impressions were abdominal pain, questionable etiology, and chronic hematuria, questionable etiology. Plaintiff was referred to a urologist. (T. 277) On December 23, 2009, an X-ray of her abdomen showed stool without signs of stasis. (T. 517)

On December 28, 2009, Plaintiff went to the emergency room at Forks Community Hospital due to abdominal pain and distention of her abdomen. (T. 506) Plaintiff's pelvic ultrasound showed an incidental discovery of endometrial calcifications, which were nonspecific and generally associated with benign processes.  The radiologist observed calcifications that might be related to a prior pregnancy or an endometrial polyp, however no convincing signs of a polyp were seen. Otherwise, it was a negative pelvic ultrasound. (T. 269) The doctor found no reason for any distention and diagnosed her with abdominal pain of undetermined etiology, and hematuria. (T. 507)

Dr. Carleen Bensen, urologist at the Forks Community Hospital Bogachiel Clinic, conducted a urology consultation on December 30, 2009.  At the time of the consultation, Plaintiff was taking Docusate, Senna, Cephalexin, Mirtazapine and Reglan. During this consultation, Dr. Bensen observed Plaintiff was a very pleasant lady and discussed the fact there was no evidence of any kidney stones.  (T. 244) Plaintiff indicated this problem had occurred since she was a child, and was told by her psychologist it was stress related. (T. 248) Plaintiff's urinalysis showed 250 milligrams per deciliter of blood in her urine.  Dr. Bensen began to entertain other diagnoses for gross hematuria and wanted to get an MRI of the abdomen. (T. 244-245)

An MRI taken on December 31, 2009, showed the liver, gallbladder, pancreas, spleen and adrenal glands were unremarkable.  The kidneys were unremarkable and both excreted gadolinium contrast.  There was no hydronephrosis.  The renal pelves were grossly unremarkable, ureters and bowel were not dilated, and there was no intra-abdominal lymphadenopathy or free fluid.  The doctor's impression was an unremarkable abdomen. (T. 266)

On January 19, 2010, Plaintiff's urinalysis showed presence of blood and her leukocyte esterase and red blood cell counts were high. (T. 257) On January 23, 2010, Plaintiff went to the emergency room at Forks Community Hospital due to flank pain.  Plaintiff stated it had gotten worse over the past month, she felt feverish, and had chills and sweats.  Plaintiff's urinalysis showed high traces of blood and bacteria. (T. 253) Plaintiff's white blood count, mean corpuscular hemoglobin and absolute neutrophil counts were high. (T. 254) Plaintiff had traces of blood in her urine. (T. 504) The doctor's impressions were right flank pain and hematuria. (T. 504)

On February 2, 2010, Dr. Bensen saw Plaintiff after she was released from the hospital for a urinary tract infection and prescribed an antibiotic, probably Levaquin.  Plaintiff experienced difficulties walking while taking Levaquin. Once she stopped taking Levaquin, she was able to

6

walk.  Another X-ray showed no abnormalities.  Plaintiff indicated, she, her daughter and mother all had the same problem. Plaintiff was given a prescription for Toradol, so she could return to work.  Plaintiff was concerned with the effect Toradol would have on her kidneys.  Dr. Bensen indicated Plaintiff was doing quite well and discussed LPHS.  At the time, Plaintiff indicated she wanted to try a natural approach for treatment.  Dr. Bensen noted there might have been a role of angiotensin converting enzyme inhibitors, but since Plaintiff was doing better, she did not want to put her on anything. (T. 273)

On February 18, 2010, Plaintiff was seen at Bogachiel Clinic by Advanced Registered Nurse Practitioner Leonard Hitz ("ARNP Hitz") as she had felt sick and drugged out the past couple of days.  She felt better on the day of her appointment, but Plaintiff wanted reassurance regarding her diagnosis. (T. 240)

On March 11, 2010, Plaintiff met with ARNP Hitz at Bogachiel Clinic.  ARNP Hitz indicated he wanted to increase her Mirtazapine, antidepressant.  While Plaintiff felt the medicine seemed to have helped, she was still nauseous.  She had tried several over-the-counter remedies, but nothing has helped.  ARNP Hitz assessed Plaintiff with upset stomach, intermittently, flank pain, hematuria and prescribed Hydroxyzine, and Mirtazapine. (T. 238)

Plaintiff saw Advanced Registered Nurse Practitioner ("ARNP") LaRayne Ness at Bogachiel Clinic due to flank pain, abdominal pain, which radiated to her back, and hematuria on May 19, 2010. (T. 236) ARNP Ness diagnosed her with LPHS and flank pain.  The notes indicated research had showed that ACE prescriptions may be of benefit for treatment.  Plaintiff indicated she was willing to try and was prescribed Lisinopril. (T. 236)

On May 26, 2010, Plaintiff went to the Bogachiel Clinic due to headaches, cough, difficulty staying awake on her medicine, Lisinopril, and tenderness in back.  Notes indicated her flank pain

was gone, she was "ill looking," and had abdominal tenderness.  Plaintiff was assessed with LPHS, controlled, headaches, nausea, vomiting, cough and fatigue. (T. 235) Plaintiff discontinued Lisinopril, due to side effects, and prescribed Benazepril. (T. 235)

On June 7, 2010, Plaintiff walked into Bogachiel Clinic and complained of nasal congestion and cough.  While her LPHS was better, she felt better on Lisinopril, where she did not have pain.  Plaintiff had a dull internal pain on Benazepril.  The notes indicated Plaintiff was a thirty-seven year old "ill looking" female.  Plaintiff was prescribed Azithromycin, a nasal spray, Claritin, and advised to continue Benazepril.

Plaintiff established care with Lapine Community Clinic, Lapine, Oregon, on August 30, 2010.  Plaintiff had an extensive history of flank pain with hematuria and brought her medical records from Washington.  Included in one of the records was a diagnosis from a nephrologist who diagnosed Plaintiff with LPHS. The records indicated Plaintiff was to be treated by natural remedies, with no mention of pain medication. Plaintiff was assessed with chronic kidney disease, unspecified, and tobacco abuse. (T. 222) Plaintiff was counselled on the pain policy, but Tramadol would not be prescribed.  Plaintiff was referred to a nephrologist for diagnosis and treatment.  Plaintiff was prescribed Benazepril. (T. 220)

On September 9, 2010, Dr. Michael Feldman, with Bend Memorial Clinic, Bend, Oregon, conducted a new patient evaluation, and assessed Plaintiff with LPHS and chronic pain syndrome.  Plaintiff complained about nausea, intermittent abdominal distention and swelling, intermittent flank pain, and she did not have gross hematuria, but had tea colored urine.   Dr. Feldman observed Plaintiff was frustrated at the lack of progress with regard to her health concerns over the years.  Plaintiff indicated her primary care physician was unwilling to send her to a nutritionist and would not refill her Tramadol. (T. 227) He informed her that he was not against sending her to a

8

nutritionist, but that would not likely help her pain or her hematuria. He encouraged her to consider whether or not she wanted to see him again, as all he could offer were kind words and medications, which she declined. (T. 227) Dr. Feldman prescribed Tramadol. (T. 228)

On October 26, 2010, Plaintiff had a nuclear biliary scan and gallbladder ejection fraction performed at St. Charles Medical Center, Bend, Oregon, by Dr. Steven J. Michel.  The results showed the liver, gallbladder, gallbladder ejection fraction and bile ducts were normal. (T. 486)

On November 16, 2010, Plaintiff had an appointment with Karen Maier, licensed social worker with Deschutes.  At the time, Plaintiff was 38 years of age, divorced with four children.  She came to Oregon with her daughter, who was sixteen years of age, to see the birth of her grandchild.  While here, her car engine blew up and she was stranded with no way to return to Washington and her ex-husband would not return their son.  Ms. Maier observed Plaintiff was anxious and overwhelmed during the session.  While Plaintiff denied depression, Ms. Maier observed multiple physical symptoms and diagnoses that impinged on her mental health.  Plaintiff was frustrated and angry with the medical community.  Plaintiff was diagnosed with posttraumatic stress disorder. Plaintiff's plan included twelve individual therapy sessions and invited to attend other therapy sessions. (T. 329)

On November 30, 2010, Plaintiff informed Ms. Maier that she and her daughter were kicked out of their living situation.  She did not want to go to the shelter in Bend, as that was where her stepbrother, who was about to get out of jail, would go. (T. 327) Ms. Maier observed Plaintiff's physical problems made it financially difficult. (T. 327)

Plaintiff saw Ms. Maier on December 10, 2010, for her scheduled individual appointment.  Ms. Maier observed Plaintiff looked tired, stressed, frustrated, and ill.  Plaintiff wanted to go back to

school, and provide for her family, however she had multiple stressors and it was difficult to focus on the positives when she was struggling. (T. 321)

On December 16, 2010, Plaintiff saw Dr. Feldman, due to nausea, vomiting, abdominal pain, essential hematuria, loin pain hematuria and chronic pain syndrome. The notes indicated Plaintiff was not able to afford Zofran and her insurance would not authorize it, despite the fact it was the only effective intervention. (T. 281) Plaintiff had previously tried Phenergan, Compazine, Benzodiazepine and selective serotonin reuptake inhibitors. The doctor indicated he would get back with the patient after he reviewed the studies. (T. 281)

On December 23, 2010, Plaintiff was referred to Korena Larsen Farris, physician's assistant ("PA Farris"), at The Center in Bend, Oregon, due to chronic flank pain and history of LPHS. (T. 694) Notes indicated Plaintiff only took Tramadol when the pain was severe, she did not take it daily, but when she did take it the pain was better. Plaintiff had chronic numbness and tingling in her arms and legs, and chronic weakness. She was depressed and had tried Paxil, BuSpar, Cymbalta and Zoloft, some of which had caused suicidal thoughts. Plaintiff had side effects with Percocet, Morphine and Vicodin. (T. 694) PA Farris observed Plaintiff had decreased range of motion with flexion and extension of the lumbar spine and tenderness bilaterally in the costovertebral angle. Plaintiff had a mild positive compression test, mild tenderness bilaterally in the S joints and trochanteric regions, and 14/18 tender fibromyalgia points. (T. 696) Plaintiff signed a pain contract and was prescribed Gabapentin. (697-698)

Plaintiff saw PA Farris on January 6, 2011.  At this visit, Plaintiff indicated the first three days she had taken Gabapentin, she was unable to keep it down.  On the third day her pain decreased and she was able to sleep. (T. 692) Plaintiff had 4 out of 18 tender fibromyalgia points.  PA Farris assessed Plaintiff with abdominal pain, myalgia and myositis, and sleep disturbances.

Treatment notes from Deschutes indicated Plaintiff felt good and confident on January 20, 2011.  She had no unsafe behavior and completed her commitment (T. 317); however, at a group meeting on January 24, 2011, Plaintiff felt overwhelmed and was trying to learn good coping. (T. 315)

On February 3, 2011, Plaintiff contacted Ms. Maier and informed her she could not afford to come to her appointment.  They had moved out of their place, she was not able to find work, and her daughter was having difficulty in school.  Ms. Maier discerned Plaintiff was trying to deal with these issues, but her unstable living did not help. Ms. Maier noted Plaintiff's medical issues, which often made her sick, prevented her from work, although she had skills. (T. 313)

On February 4, 2011, PA Farris assessed Plaintiff with abdominal pain, nausea and sleep disturbances. (T. 690) Plaintiff was prescribed Prochlorperazine Maleate and Gabapentin.  PA Farris noted, while her overall pain improved, she continued to have nausea. (T. 690)

Plaintiff went to Northwest Arkansas Regional Medical Center and Clinics ("NARMC") in Harrison, Arkansas, on June 1, 2011, due to kidney pain and fever. (T. 288) Plaintiff's pain and fever began a week ago, she felt cold and weak.  She had chronic kidney pain, but it was not any worse at the time, despite the fact she vomited a couple of times the week prior.  Plaintiff denied any abdominal pain at the time of examination. The urinalysis showed the presence of blood. (T. 398) The blood test showed low levels of mean platelet volume and anion gap and high levels of hematocrit and mean corpuscular hemoglobin. (T. 403) The doctor diagnosed her with a urinary tract infection, prescribed Bactrim and discharged Plaintiff. (T. 299)

On August 2, 2011, Plaintiff went to the emergency room at NARMC as she needed her fibromyalgia medication refilled. (T. 405) Records indicated she had gastrointestinal symptoms of nausea on a daily basis. (T. 407) Plaintiff had been on medical marijuana, Percocet, Tramadol and

Zofran. (T. 410) Plaintiff was referred to Dr. Hawk for chronic pain management. The emergency room doctor refilled her prescriptions for Tramadol, Neurontin and Zofran. (T. 410-411)

Plaintiff was seen at the emergency room at NARMC due to right side flank pain, with a history of LPHS, and kidney stones on September 25, 2011. (T. 414) The urinalysis showed a presence of blood. Plaintiff's hematology and chemical reports showed low levels of mean platelet volume and liver transaminases and high levels of white blood count, hematocrit and mean corpuscular hemoglobin. (T. 424, 430-431) An ultrasound showed no acute abnormality of the gallbladder. (T. 432) A CT of the abdomen and pelvis area showed mild prominence of the gallbladder, no obstruction of upper urinary tracts, and no free air or free fluid. (T. 433) Plaintiff was diagnosed with abdominal pain, prescribed Phenergan and Lortab and discharged. (T. 425)

On September 27, 2011, Plaintiff went back to the emergency room at NARMC and complained of, left flank pain, nausea, and feeling syncope. (T. 434) Plaintiff had not felt better since she left on September 25, 2011.  Her medical history showed fibromyalgia and thin basement membrane disease. (T. 442) In an emergency room addendum, the notes indicated for the past ten years Plaintiff had abdominal pain due to thin basement membrane disease known as LPHS[1]. (T. 633) Plaintiff's urine showed the presence of blood. (T. 444) The hematology, and chemical reports showed low levels of mean platelet volume and liver transaminases and high levels of white blood count, hematocrit, mean corpuscular hemoglobin and neutrophils. (T. 452) A CT of the abdomen showed no acute abnormality and the chest X-ray was normal. (T. 456-457)

---

[1] LPHS and thin basement membrane disease are two separate diseases. "Thin basement membrane disease (TBMD) is an inherited disorder that mainly affects the glomeruli, which are tiny tufts of capillaries (small blood vessels) in the kidneys that filter wastes from the blood. It is a rare disorder that has been diagnosed in less than 1 percent of the population." https://www.kidney.org/atoz/content/Thin-Basement-Membrane-Disease. "Loin pain hematuria syndrome (LPHS) is a condition that is characterized by persistent or recurrent loin pain and hematuria." (blood in the urine). http://rarediseases.info.nih.gov/gard/6920/loin-pain-hematuria-syndrome/resources/1.

Dr. Dwight Zabel, nephrologist, reviewed the case and opined Plaintiff's thin basement membrane disease was a minor disorder, which should not cause pain and her labs did not need to be evaluated further.  Dr. Zabel was not familiar with LPHS. (T. 633) Dr. Jose Padilla, general surgeon, reviewed the case and determined she needed a hepatobiliary iminodiacetic acid scan. Plaintiff agreed to see Dr. S. Armstrong for a recheck the following day. (T. 445) The doctor's impressions were abdominal pain and leukocytosis. (T. 445) The hepatobiliary scan with stimulated gallbladder ejection fraction study was normal. (T. 460)

On November 25, 2011, Plaintiff went to the emergency room at NARMC due to vomiting twenty times in one day. (T. 655) Plaintiff stated she had right facial pain, but it had resolved.  Her urinalysis showed traces of blood. (T. 656) The hematology report show high levels of white blood count, hematocrit, mean corpuscular hemoglobin, basophils and neutrophil and a low level of mean platelet volume.  Plaintiff also tested positive for marijuana. (T. 664) The doctor's impressions were Plaintiff had generalized weakness and anxiety. (T. 670) She was prescribed Bactrim, Phenergan and Zofran. (T. 657)

On December 5, 2011, Plaintiff's labs showed high levels of mean corpuscular hemoglobin, neutrophil and glucose and low levels of red blood cell, mean platelet volume and aspartate aminotransferase. (T. 675) The urinalysis showed traces of blood. (T. 676) A head CT, chest X-ray showed no acute abnormalities. (T. 678-679) The EEG findings were within the range of normal variation. (T. 683)

On July 28, 2012, Plaintiff went to the emergency room at NARMC due to pain, nausea and vomiting. (T. 760, 762) Plaintiff requested a refill of her Zofran and Phenergan, but refused further intervention. (T. 767) The laboratory tests showed an increase of blood in her urine. (T. 769) Plaintiff was diagnosed with chronic kidney disease and urinary tract infection. (T. 774)

On July 31, 2012, Plaintiff went to the emergency room at NARMC due to chronic kidney disease, LPHS, blood in urine, and weakness. (T. 788) Laboratory testing showed blood in her urine, high levels of hematocrit, mean corpuscular hemoglobin and chloride and low levels of mean platelet volume, international normalized ratio, carbon dioxide, and creatine kinase MB isoenzyme.  (T. 804, 805) A CT of the brain and chest were both normal. (T. 809) The ECG was normal and no significant change had occurred since the last ECG on December 5, 2011. (T. 810-811) Plaintiff was diagnosed with back pain or injury, chronic hematuria and prescribed Tramadol, Bactrim and Zofran. (T. 793-795, 799)

The opinion evidence is as follows.

Dr. Bill F. Payne, state medical consultant, reviewed the records on July 12, 2011, and determined plaintiff's physical impairments were non severe. (T. 387) Ronald Crow, D.O., state medical consultant, reviewed the records on December 12, 2011, and affirmed Dr. Payne's assessment. (T. 468)

On August 10, 2011, W. Charles Nichols, Psy.D., performed a psychological consultative examination.  Dr. Nichols observed Plaintiff was dressed appropriately, groomed, she looked considerably older than her chronological age, there were no signs of discomfort during the interview, and her affect was mildly dysphoric with reduced range of intensity.  In the beginning, she was irritable and sarcastic, however after Dr. Nichols addressed it she became cooperative and gave an effort during the examination.  (T. 362-363) Dr. Nichols determined Plaintiff appeared capable of counting change and managing personal finances. (T. 365)  Dr. Nichols diagnosed Plaintiff with major depressive disorder, single episode, mild history of alcohol abuse, personality disorder, not otherwise specified, with cluster B traits, and a GAF score of 55. (T. 364) Plaintiff's symptoms were mild in severity and did not impair her functioning to the extent she was unable to

14

work as a housekeeper. Dr. Nichols determined her personality disorder was associated with general life instability and the lack of ability to sustain employment and responsibilities. (T. 364) He did not observe signs of exaggerations or malingering.  Plaintiff's allegations of depression appeared to be congruent with her clinical presentation during the interview. (T. 365)

On August 12, 2011, Chery Woodson-Johnson, Psy.D., psychiatrist and state medical consultant, conducted a psychiatric review for a  mental RFC, and determined Plaintiff was able to perform work where interpersonal contact was incidental to work performed; complexity of the tasks was learned and performed by rote, few variables, and little judgment; and supervision required was simple, direct and concrete.  She could perform work at an unskilled level.  (T. 382) On December 6, 2011, Dr. Kay M. Gale, state medical consultant, reviewed the records and affirmed the assessment of Dr. Woodson-Johnson. (T. 467)

## IV.   Discussion:

The Court must determine whether substantial evidence, taking the record as a whole, supports the Commissioner's decision that Plaintiff was not disabled from March 15, 2010, through February 1, 2013.  On appeal, Plaintiff raises the following three issues, which can be summarized as: (A) Substantial evidence did not support the ALJ's finding of not disabled; (B) the ALJ failed to fully and fairly develop the record; and, (C) the ALJ erred in finding Plaintiff's LPHS, chronic urinary tract infections and flank pain impairments non-severe. (Doc. 8, pp. 5-14) Because of the Court's ruling set forth below on points two and three, point one is not addressed herein.

**Development of the Record:**

Plaintiff argues the ALJ failed to fully and fairly develop the record. (Doc. 10, pp. 7) After reviewing the record, the undersigned finds the record did not contain substantial evidence for the ALJ to make an informed decision.

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995)(ALJ must fully and fairly develop the record so that a just determination of disability may be made). The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001). The ALJ is only required to develop a reasonably complete record. *See Clark v. Shalala*, 28 F.3d 828, 830 (8th Cir. 1994).

After reviewing the record, the undersigned finds the record did not contain sufficient evidence regarding Plaintiff's LPHS for the ALJ to make an informed decision. LPHS is a rare disease, with a prevalence of about 0.012%. Sahar Taba Taba Vakili, MD, MPH, ET AL., *Loin Pain Hematuria Syndrome*, American Journal of Kidney Diseases, 63(3): 460 (2014). "The exact underlying cause of LPHS is currently unknown; however, scientists suspect that it may be due to abnormalities of the glomerular basement membranes (the tissues in the kidney that filter blood); bleeding disorders; or crystal and/or stone formation in the kidneys." *See* National Center for Advancing Translational Sciences, Office of Rare Diseases Research, *Loin Pain Hematuria Syndrome,* http://rarediseases.info.nih.gov/gard/6920/loin-pain-hematuria-syndrome/resources/1 (last visited April 1, 2015). Patients with LPHS have periods of severe intermittent or persistent unilateral or bilateral loin, flank pain that radiates toward the abdominal area, medial thigh, or groin, accompanied by either microscopic or gross hematuria. Research has shown that LPHS is not associated with loss of kidney function or urinary tract infections. Sahar Taba Taba Vakili, MD, MPH, ET AL. 63(3): at 460.

16

Patients initially present with flank pain and/or hematuria. "Episodes of gross hematuria are almost always accompanied by worsening pain and usually last a few days, but gross hematuria and pain can persist for weeks to months.  Between episodes of gross hematuria, urinalysis typically shows microscopic hematuria; however, sometimes the hematuria clears up, but the pain persists." *Id.* at 461. Patients reported the loin pain felt like burning or throbbing, and it may radiate to the abdomen, inguinal area or medial thigh.  "The onset of pain is associated with nausea and vomiting, and the patient may be unable to manage the pain with oral opioids." *Id.* Diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests. *Id.*

Most patients with LPHS are treated through pain management, with the use of opioids.  A majority of LPHS patients have pain that will disrupt their lifestyle and often can only be managed through high doses of analgesics and hospitalizations. *Id.* at 469 Depression and suicide rate for LPHS patients was found to be higher than in the general population. While some patients will be treated successfully by the use of a pain clinic, most will only experience partial pain relief. *Id.* To date, there is no cure for LPHS.

In the case at hand, the ALJ failed to order a consultative examination regarding Plaintiff's LHPS.  An ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) (2006).  In the case at hand, LPHS is a rare disease, so rare that nephrologist, Dr. Zabel, was not familiar with the disease.  A consultative examination from a nephrologist, who is or would be willing to become familiar with LPHS, would have aided the ALJ in making an informed decision as to the nature of any functional limitations resulting from Plaintiff's LPHS. *See Gasaway v. Apfel,* 187 F.3d 840, 842 (8th Cir. 1999); *Freeman v. Apfel*, 208 F.3d 687, 692

(8th Cir.2000) ("[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."(citation and internal quotes omitted)).

In order for the ALJ to make an informed decision as to whether Plaintiff was disabled, the ALJ must first be informed about LPHS.  On remand, the ALJ is directed to obtain an RFC, detailing Plaintiff's conditions and limitations, from a nephrologist who is familiar, or willing to become familiar, with LPHS.  The RFC shall reflect the doctor has reviewed the literature and familiarized himself with its limitations, a "check the box" RFC is not appropriate in this case.

**<u>Severity of Plaintiff's Impairments:</u>**

Plaintiff alleges the ALJ erred when he found the Plaintiff's LPHS, chronic urinary tract infections and flank pain impairments non-severe. The undersigned finds there was not sufficient evidence for the ALJ to make an informed decision with regard to the severity of Plaintiff's LPHS.

A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)). The impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms (see [20 C.F.R.] § 404.1527). 20 C.F.R. § 404.1508.

In determining whether Plaintiff's LPHS was severe, the ALJ considered Plaintiff's intermittent flank pain and the fact her stomach pain was probably secondary to symptoms of anxiety. The ALJ further relied upon the medical evidence showing Plaintiff had normal CT scans, IVP, cystoscopy, cytology, and all of her work-ups were negative.  Plaintiff was consistently

diagnosed with urinary tract infections, and at one point it was noted Plaintiff's LPHS was controlled.  The ALJ also considered the inconsistencies of Plaintiff's testimony and activities of daily living. (T. 14)

While normally relying on medical diagnostic tests is one basis for determining whether an impairment is severe, diagnosing LPHS is based "more on the exclusion of alternative causes combined with flank pain and hematuria on a thorough evaluation." Sahar Taba Taba Vakili, MD, MPH, ET AL. 64(3): at 464. Diagnosing LPHS is similar to diagnosing fibromyalgia, where there are no laboratory tests for the presence or severity of fibromyalgia, and treatment includes exercise, local heat, stress management, drugs to improve sleep, and analgesics. THE MERCK MANUAL, *Fibromyalgia*,   http://www.merckmanuals.com/professional/musculoskeletal-and-connective-tissue-disorders/bursa-muscle-and-tendon-disorders/fibromyalgia(last review February 2010). In dealing with fibromyalgia, the cause or causes are unknown, there is no cure, and, perhaps of greatest importance to disability law, its symptoms are entirely subjective.  The disease is chronic, and "[d]iagnosis is usually made [only] after eliminating other conditions." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003).

In reviewing the record, it appears to the undersigned Plaintiff had symptoms consistent with LPHS, severe flank pain and hematuria. (T. 253, 265, 277, 507) Dr. Bensen conducted thorough examinations of the Plaintiff prior to diagnosing her with LPHS. Once diagnosed, Plaintiff began treatment.  While Plaintiff attempted, initially, a natural treatment, Plaintiff was later prescribed Tramadol, Gabapentin, Toradol, and Lortab to alleviate the pain. (T. 222, 228, 236, 242, 400, 425, 504, 692, 698, 793)

The ALJ relied upon the fact the nurse practitioner noted Plaintiff's LPHS was controlled, yet, Plaintiff continued to seek treatment for vomiting, nausea, flank pain and urinary tract infections.

(228, 281, 288, 407, 414, 434,655, 760, 788)  The frequency of hospital and doctor visits show Plaintiff continued to seek treatment for her symptoms associated with LPHS.

As for the Plaintiff's ability to perform basic work like activities, Plaintiff testified she had lost eight or nine jobs, due to her missing work due to illness. (T. 33-34) Plaintiff also indicated in her work activity report on June 9, 2011, she was fired due to missing work for her medical condition. (T. 141) Moreover, her licensed social worker documented Plaintiff's medical issues often kept her sick and prevented her from work, although she had skills. (T. 313)

During her initial intake interview, the interviewer observed Plaintiff was very emotional and cried.  Plaintiff had dark circles under her eyes, a cold sore in the corner of her mouth, and spoke with a raspy voice.  When the interviewer asked Plaintiff if she had a sore throat, Plaintiff indicated she vomited so often it kept her throat messed up.  Plaintiff also stated that doctor's just kept putting her on strong medications and the drugs kept her from being able to function and have a normal life. (T. 149)

Plaintiff vomited on a daily basis and once the pain started, nothing seemed to help. (T. 32) As for her sleeping, either the pain or vomiting usually kept her awake. (T. 33) She did not like to go out in public, as she feared she would vomit on someone. (T. 36) In one day Plaintiff vomited twenty times. (T. 655)

Plaintiff was no longer able to operate a chainsaw, and it had become hard for her to hold heavy objects, thread a bolt or even hold a hairbrush, due to her loss of strength and dexterity in her fingers. (T. 183) She also had to watch the type of foods she ate and the medicine she took, as it might have an adverse effect on her kidneys. (T. 183) Plaintiff tried to go outside daily, however, sometimes she was physically unable and would be bedridden for a few weeks. (T. 185)

In light of the medical evidence, Plaintiff's testimony, and her treating physician's records, it appears the ALJ gave little weight to the consistent diagnosis of LPHS or its debilitating effect on the Plaintiff.   On remand, the ALJ should reconsider whether Plaintiff's LPHS diagnosis constituted a severe impairment.

## Conclusion

Based on the foregoing, I must reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

Dated this 30th day of April, 2015.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE